**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CIGAR ASSOCIATION OF AMERICA *et al.*,** *Plaintiffs* | : | **CIVIL ACTION** |
| **v.** | : | |
| **CITY OF PHILADELPHIA *et al.*,** *Defendants* | : | **No. 20-3220** |

# MEMORANDUM

PRATTER, J. NOVEMBER 13, 2020

Plaintiffs in this case seek a preliminary injunction against the City of Philadelphia, enjoining it from enforcing Ordinance 180457. The Ordinance prohibits all sale of flavored tobacco products, with minor exceptions. Plaintiffs argue that the Ordinance is preempted by Pennsylvania law. The Court agrees. Youth access to tobacco is indeed a matter of grave concern. But the General Assembly already considered this, weighed the options, and chose the course it would chart for the Commonwealth of Pennsylvania. It also chose to preempt municipalities from making a detour. The Court and the City of Philadelphia are therefore bound to stay on the path set by the General Assembly.

Because Plaintiffs have demonstrated a likelihood of success on the merits, would be irreparably harmed absent an injunction, and because the balance of the equities and the public interest weigh in favor of an injunction, the Court grants Plaintiffs' motion for a preliminary injunction.

## I. Background

This case concerns a preliminary injunction against the City of Philadelphia from enforcing Ordinance 180457. One of the Ordinance's stated purposes is to reduce the consumption of tobacco products by minors. Pennsylvania law already prohibits the sale of tobacco to minors. But the City concluded that existing measures were somehow insufficient, citing a variety of statistics. The City observed a sharp increase in the use of flavored tobacco products. According to the City, 81% of youth who have used tobacco report starting with a flavored tobacco product. This problem is even more marked in low-income and minority neighborhoods. 29% of Philadelphians at or below the poverty line smoke, compared to 19% of those living above the poverty line. 23% of African Americans in Philadelphia smoke, compared with 17% of white residents.

The City passed the Ordinance to combat these threats to the public health. The Ordinance prohibits the sale of tobacco products with "characterizing flavors," which is defined as any "taste or aroma[] other than the taste or aroma of tobacco." The Ordinance includes a narrow exception for "Tobacco Products Distribution Businesses," defined as businesses that derive 90% or more of their sales from tobacco products and do not sell food.

Plaintiffs, a group of cigar manufacturers, importers, and distributers, filed a complaint in the Philadelphia Court of Common Pleas seeking declaratory and injunctive relief, as well as money damages. The City chose to remove the complaint to the Eastern District of Pennsylvania. Plaintiffs then moved this Court for a preliminary injunction.

Plaintiffs originally argued that the Ordinance violates Plaintiffs' right to substantive due process, that the Ordinance was unconstitutionally vague, and that the Ordinance was preempted.

Plaintiffs have since dropped their federal constitutional claims for purposes of this preliminary injunction, and rely only on their preemption arguments.

## II. Discussion

Preliminary injunctions are an equitable remedy, the granting of which "rests in the sound judicial discretion of the trial court." *Calabrese v. Local 69 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus. of U. S. & Can.*, 312 F.2d 256, 256 (3d Cir. 1963) (quoting *Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc.*, 268 F.2d 569, 573 (3d Cir. 1959)). A preliminary injunction is an "extraordinary remedy" that never issues as of right. *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). Rather, the party seeking the injunction must demonstrate that they meet the familiar four-factor test: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Id.* The Court considers each of these factors in turn.

### A. Likelihood of Success on the Merits

Plaintiffs argue that two Pennsylvania statutes preempt the Ordinance: 53 Pa. C.S. § 301 ("§ 301") and Act No. 2018-42, Section 232-A ("Act 42"), codified at 72 P.S. § 232-A. The Court will first consider § 301 preemption.

Section 301 expressly preempts "any local ordinance or rule concerning the subject matter of 18 Pa.C.S. § 6305." Section 6305, in turn, contains five prohibitions which all relate to tobacco: (1) "sell[ing] a tobacco product to any minor;" (2) "furnish[ing], by purchase, gift or other means, a tobacco product to a minor;" (3) "locat[ing] or plac[ing] a vending machine containing a tobacco product in a location accessible to minors;" (4) "display[ing] or offer[ing] a cigarette for sale out of a pack of cigarettes;" or (5) "display[ing] or offer[ing] for sale tobacco products in any manner

which enables [a customer] . . . to physically handle tobacco products prior to purchase unless the tobacco products are located within the line of sight or under the control of a cashier or other employee during business hours, except[ing] . . . retail stores which derive 75% or more of sales revenues from tobacco products." 18 Pa. C.S. § 6305.

To determine whether § 301 preempts the Ordinance, the Court must answer two questions. First, what is the "subject matter" of § 6305? Second, does the Ordinance "*concern* [this] subject matter"? Because § 6305's subject matter is "youth access to tobacco," and the Ordinance concerns youth access to tobacco, Plaintiffs have demonstrated a likelihood of success on the merits of § 301.

*i. Section 6305's Subject Matter*

The parties disagree about what § 6305's subject matter is. Pointing to § 6305's repeated reference to minors, Plaintiffs argue that its subject is "youth access to tobacco." The City responds that its subject matter is just the five narrow areas it expressly regulates, namely, selling tobacco to a minor, giving tobacco to a minor, selling tobacco in vending machines accessible to minors, selling loose cigarettes, and allowing customers to handle tobacco before purchase.

But this substantive discussion is preceded by a disagreement regarding the appropriate amount of deference owed to the City. The City argues that "caselaw demands that the Court construe any ambiguities in favor of municipal power and against preemption, thus calling for the narrowest reading of preemption that the statutory language allows." (Doc. No. 9 at 43.) This is incorrect. The City confuses the standards for implied preemption and express preemption.

In implied preemption cases, courts resolve all "ambiguities regarding [local] authority [] in favor of the municipality." *Nutter v. Dougherty*, 938 A.2d 401, 414 (Pa. 2007). For a court to find implied preemption, "the General Assembly must clearly evidence its intent to preempt."

*Hoffman Min. Co., Inc. v. Zoning Hearing Bd. of Adams Twp., Cambria Cty.*, 32 A.3d 587, 593 (Pa. 2011).

But this is an express preemption case, because the General Assembly *has* "clearly evidence[d] its intent to preempt." *Hoffman*, 32 A.2d at 593. The only question here is the scope of preemption. *See JoJo Oil Co. v. Dingman Twp. Zoning Hearing Bd.*, 77 A.3d 679, 690 (Pa. Commw. Ct. 2013) ("When examining an express preemption clause, the task of statutory construction must in the first instance focus on the plain wording of the express preemption clause, which necessarily contains the best evidence of the legislature's preemptive intent."). In determining the scope of preemption, the Court must examine the range of plausible interpretations and choose the one that is most probable, not the reading most favorable to the municipality that just crosses the threshold of plausibility.[1]

The best reading of the statute is the one urged by the Plaintiffs. The Court cannot credit the City's argument that the "subject matter" of § 6305 is only the five narrow areas directly regulated by the statute. The word "subject" signals a higher level of abstraction than the thing it is a subject of. For example, addition and subtraction would be said to fall under the general subject of "mathematics." "The Old Man and the Sea" by Ernest Hemmingway and "The Martian" by Andy Weir take place on different planets, but both could be said to share a subject: Humanity

---

[1] None of the cases cited by the City contradict this view. The language the City quotes from *Hoffman* is in the context of a discussion of field preemption. *See* 32 A.3d at 593 ("However, the mere fact that the General Assembly has enacted legislation in a field does not lead to the presumption that the state has precluded all local enactments in that field; rather, the General Assembly must clearly evidence its intent to preempt."). While *Hoffman* did separately consider express preemption, at that stage the court simply looked to the plain meaning of the preemption provision, and never suggested that it was construing the statute any more broadly or narrowly than the plain meaning required. *See id.* at 600-01. *Nutter* did not consider express preemption at all, only field and conflict preemption. *See Nutter* at 411 ("Appellants . . . do not suggest that the General Assembly expressly signaled its preemptive intent . . . ."). And *Delaware County* never mentioned preemption, but instead considered the scope of a municipality's powers under the Home Rule Charter. *See Delaware Cty. v. Middletown Twp.*, 511 A.2d 811, 813-14 (Pa. 1986).

vs. Nature. Dictionary definitions confirm the view that the word "subject" has a connotation closer to "theme" than "content." *See* Subject, Shorter Oxford English Dictionary (6th ed. 2007) ("The matter or theme dealt with by an art or science; . . . The theme of a literary composition."); Subject, Black's Law Dictionary (11th ed. 2019) ("The matter of concern over which something is created . . . Also termed . . . *subject matter*." (emphasis in original)).

But these definitions give, at best, vague guidance for *how* to sift the various subsections of a statute to discern its subject. The Court is guided by the venerated canon that "similar statutes are to be construed similarly (also known by its Latin label of *in pari materia*)." *Lafferty v. St. Riel*, 495 F.3d 72, 82 (3d Cir. 2007).

A similar Pennsylvania statute including the phrase "concerning the subject matter of" was interpreted in the case of *Mitchell's Bar*, and its analysis is instructive. *See Mitchell's Bar & Rest., Inc. v. Allegheny Cty.*, 924 A.2d 730, 737 (Pa. Commw. Ct. 2007). In that case, the General Assembly had considered how to address the dangers of indoor smoking, and chose to address it by passing a statute (§ 10.1) which required some restaurants to create smoking and non-smoking areas. In circumstances somewhat analogous to this case, Allegheny County found that solution incomplete, and completely banned indoor smoking in any place open to the general public, including restaurants. *Id.* at 734-35. The plaintiffs in that case argued that the ban was invalid because the General Assembly had passed statute preempting "any local ordinance or rule concerning the subject matter of section[] . . . 10.1 of this act." *Id.* at 737 (quoting 35 Pa. C.S. § 1235.1(a) (repealed 2008)). That court faced the same dilemma at issue here: how to define § 10.1's subject matter.

The *Mitchell's Bar* court derived § 10.1's subject by looking to its title, purpose, and text. Section 10.1 was titled the "Clean Indoor Air Act," and it included an announcement of its purpose

in the text of the statute itself. That stated purpose was "to protect the public health and to provide for the comfort of all parties by regulating and controlling smoking in certain public places and at public meetings and in certain workplaces." *Id.* at 733 (quoting 35 P.S. § 1230.1(a)). Section 10.1 accomplished this purpose by requiring restaurants with more than 75 seats to create smoking and nonsmoking areas and to take steps to prevent smoking in the nonsmoking areas. *Id.* It required restaurants with fewer than 75 seats to either do the same, or post notice that it had no nonsmoking space. *Id.* It also created a $50.00 fine for each violation. 35 P.S. § 1235.1(h).

Having examined § 10.1's text, title, and purpose, the court concluded that § 10.1's subject matter was "indoor smoking in restaurants." *Mitchell's Bar*, 924 A.2d at 737. The court did not detail how it reached this conclusion. But what is most useful here is to note what the court did *not* do. It did not state that § 10.1's subject matter was "requiring restaurants with more than 75 seats to create nonsmoking areas," "requiring restaurants with fewer than 75 seats to either create nonsmoking areas or post a notice," and "punishing violators with a $50.00 fine." Rather, it defined the subject matter at a high enough level of generality to succinctly communicate its essence, but also a low enough level of generality to remain tethered to the specific provisions of each subsection. Said another way, the court considered the statute's "subject matter" to be the thematic thread that bound each element of the statute together. *See also Consolidated Rail Corp. v. Penn. Pub. Utility Comm'n*, 536 F. Supp. 653, 657-58 (E.D. Pa. 1982) (federal rule regulating speed recorders had a subject matter of "speed control"). The Court will seek to do the same with § 6305.

But before construing § 6305's subject matter, the Court notes that where the General Assembly expressly intends to preempt local action on only the exact, limited matters contained in a statute, it has used very different language than the language present in § 301 or the statute in

*Mitchell's Bar*. Instead, the General Assembly has accomplished this task by passing a statute that preempts only "regulations, codes, statutes, or ordinances" that "regard[] the matters expressly set forth in this act." 72 P.S. § 2306. Thus, had the General Assembly wished to preempt only the five narrow areas in § 6305, it could and presumably would have used similar language. Courts often reject an interpretation of a statute where the legislature has elsewhere used different language to reach that result. *See Admiral Ins. Co. v. L'Union des Assurances de Paris Incendie* Accidents, 758 F. Supp. 293, 295 (E.D. Pa. 1991) (rejecting an interpretation where the legislature "knows how to say" that concept by using different language); *Germantown Cab Co. v. Phila. Parking Auth.*, 36 A.3d 105, 114 (Pa. 2012) (same). The General Assembly knows how to preempt only the areas expressly covered in another section, but chose not to do that in § 301.

The Court will adopt the approach used in *Mitchell's Bar* and will construe § 6305's subject matter by looking to its text and, to a lesser extent, its title.[2] Even a cursory review of the text of § 6305 shows that the common thread that binds the statute together is preventing youth access to tobacco. Section 6305(a) creates five separate offenses. Three out of the five mention minors explicitly. *See* 18 Pa. C.S. § 6305(a)(1-2), (4). The fourth prevents customers from holding tobacco products prior to purchase, with some exceptions. *Id.* § 6305(a)(6). This provision plainly serves to reinforce the other provisions by making shoplifting tobacco products by minors more difficult. The City has articulated no other function for § 6305(a)(6), and the Court can envision none.[3] The fifth, which bans the sale of loose cigars, is admittedly more difficult to classify. *See* § 6305(a)(5). While this subsection does not mention minors, the City has previously taken the

---

2 Unlike the statute in *Mitchell's Bar*, § 6305 contains no express provision summarizing its purpose, so the Court must derive its subject matter from the text and title of the statute.

3 After all, § 6305(a)(6) could not be said to intend to prevent shoplifting generally, as retail stores have every incentive to do that on their own.

position that a ban on loose cigars was aimed at preventing the sale of tobacco products to minors. *See* Brief for Appellants at 15, *Holt's Cigar Co. v. City of Phila.*, 10 A.3d 902 (Pa. 2011) (No. 149 EM 2010), 2009 WL 6498608 ("[T]he City passed the Ordinance [banning the sale of loose cigars] to prevent the sale of tobacco products to minors."). But even if subsection (a)(5) could not be said to have "youth access to tobacco" as its subject, that would not help the City's case here because the alternative would be construing § 6305's subject matter even more broadly to "tobacco use" or even "tobacco and illicit drug use." *See id.* This broad construction is of course reinforced by § 6305's title, which is "[s]ale of tobacco products." But because the majority of § 6305(a) focuses on sale of tobacco to youth specifically, the Court concludes that "youth access to tobacco" is a more accurate summation of the statute's subject matter. And ultimately, this decision is immaterial because the Ordinance would be preempted under either construction.

While both parties focus exclusively on subsection (a), that is only a small part of § 6305. The Court must look to the entirety of § 6305 to ascertain its subject. A complete examination of the provision confirms that its subject matter is "youth access to tobacco." Subsection (a.1) makes it a violation for minors to purchase or attempt to purchase tobacco, or to represent themselves as being eligible to purchase tobacco. Subsection (c) requires the government to notify a parent or guardian whose child has been charged with an offense, and to notify an employer that its employee sold tobacco products to a minor in the course of his or her employment. Subsection (f)(1)(i) creates an affirmative defense for retailers who, among other things, check for photo identification for persons who appear to be 25 years old or younger. Finally, subsection (g) allows the Department of Health to conduct compliance checks by hiring minors to attempt to buy tobacco

from retailers. In sum, § 6305 creates a comprehensive focused scheme, and its subsections work together to combat a common subject matter: youth access to tobacco.[4]

*ii. Whether the Ordinance "concerns" youth access to tobacco*

The City also argues that even if § 6305's subject is "youth access to tobacco," the Ordinance is not preempted because it regulates everyone's access to flavored tobacco, not just youth. While the City concedes that combatting youth access to tobacco was *one* of the purposes that motivated adoption of the Ordinance, it argues that what matters "is what the Ordinance *does*, not its purpose." (Doc. No. 9 at 46.)

To begin with, what in fact is at issue is neither what the Ordinance does nor its purpose. Section 301 asks a subtly different question: whether the Ordinance "*concern[s]* the subject matter of . . . § 6305." 53 Pa. C.S. § 301 (emphasis added). The Court has already discussed the fact that "subject matter" has a broad definition. So does the word "concern." *See* Concern, Oxford English Dictionary (3d ed. 2015) ("To refer or relate to; to be about."). Section 301 thus layers one broad term on top of another. As a result, for Plaintiffs to show that the Ordinance concerns the subject matter of § 6305, they need only show that it is about or relates to youth access to tobacco. *Cf. Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47-48 (1987) (statute expressly preempting state laws that "relate to" employee benefit plans "was given its broad common-sense meaning," meaning having a "connection with or reference to such a plan" (quoting *Metropolitan Life Ins. Co. v.*

4 Because the Court finds that that the plain language of § 301 and § 6305 resolve the matter, it is unnecessary to resort to legislative history to infer the legislature's intent. *See Allegheny Cty. Sportsmen's League v. Rendell*, 860 A.2d 10, 21 (Pa. 2004) (noting that if "the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters: . . . [t]he contemporaneous legislative history" (quoting 1 Pa. C.S. § 1921(c)). And even if the Court wished to consult legislative history, that history suggests only that Senator Mowery wished to leave open regulation of tobacco advertising, which not consider today. *See* Legislative Journal (Senate), June 26, 2002, No. 48, at 2018. The Court will not abandon the best reading of a statute in the face legislative history that is ambiguous at best, and otherwise harmful to the City's position.

*Massachusetts*, 471 U.S. 724, 739 (1985)); *United Transp. Union v. Pa. Pub. Util. Comm'n*, 68 A.3d 1026, 1036-37 (Pa. Commw. Ct. 2013) (it was "not necessary for the federal regulation to be identical to the state law or order for preemption to apply" where statute preempted matters "relating to" the subject matter of another statute).

The City argues that the Ordinance does not concern youth access to tobacco because it bans the sale of flavored tobacco products to *anyone*. For purposes of this argument, the Court assumes that the City is correct in labeling the Ordinance's subject as the sale of tobacco generally, not sale of tobacco to minors. But even granting this, the Ordinance is preempted. The City admits that the Ordinance directly regulates youth access to tobacco. Just because it also regulates adult access to tobacco does not save it from preemption in this instance.

Anticipating this problem, the City pushes back by invoking the straw man of the "illogical conclusion that the City can properly ban the sale of flavored tobacco to adults but must allow the sale of flavored products to children." (Doc. No. 9 at 46.) The Court leaves to one side the question of whether the General Assembly could ever pass a statute banning the sale of flavored tobacco to adults while leaving it freely available to children, and whether this hypothetical statute would have a sufficient rational basis to withstand judicial scrutiny. It is not illogical to conclude that a statute precluding ordinances concerning youth access to tobacco would preclude a statute that covers this area and more. It *is* illogical to assume that an ordinance admittedly covering a preempted subject matter could avoid preemption merely because a municipality included some amount of non-preempted material as well. This approach would defang every express preemption statute. Unsurprisingly, the City cites no precedent for this position, and this Court has not found any.

Because the Ordinance concerns youth access to tobacco, it is preempted by § 301 and Plaintiffs have demonstrated a likelihood of success on the merits.[5]

**B. Irreparable Harm**

Preliminarily, the parties contest whether Pennsylvania or federal law governs the standard for evaluating irreparable harm. Under Pennsylvania law, there is "per se" irreparable harm if a preempted ordinance is enforced. Plaintiffs argue that, under this rule, a preliminary injunction would automatically issue if they can prove a likelihood of success on the merits. But this argument is incorrect, because the factors federal courts weigh in deciding whether to grant a preliminary injunction, including the irreparable harm factor, are governed by federal law. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989) (even where "the right upon which [a] cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions"). *See also Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 478 n.8 (E.D. Pa. 2007) (expressly refusing to apply Pennsylvania law of *per se* irreparable harm and finding that the question of irreparable harm was governed by federal law); *Viad Corp. v. Cordial*, 299 F. Supp. 2d 466, 481 (W.D. Pa. 2003) (noting that "federal law governs the standards for injunctive relief, including the irreparable harm requirement"). State law is only relevant to the prong addressing the likelihood of success on the merits.

The Court will rely on the federal irreparable harm standard. "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom*

5 Because Plaintiffs have prevailed under their § 301 argument, the Court does not address their alternate grounds for relief.

*Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000). As the City concedes, money damages against the City would not be available on Plaintiffs' preemption claims, because the City is entitled to immunity under the Eleventh Amendment. *See, e.g.*, *Temple Univ. v. White*, 941 F.2d 201, 214 (3d Cir. 1991). The City's primary response to this is that even if money damages would constitute irreparable harm, Plaintiffs' damages argument is too speculative. While this objection has some initial merit, the Court is not persuaded because Plaintiffs have introduced an expert whose report contains enough information to demonstrate that there is a "significant risk" that Plaintiffs will be harmed. *Adams*, 204 F.3d at 484.

In order to establish irreparable harm, Plaintiffs largely rely on the opinion of Dr. Peter Angelides, who holds a Doctorate of Philosophy in Economics from the University of Minnesota. Dr. Angelides also has a wealth of experience in preparing a variety of economic, fiscal, and market studies. Dr. Angelides's report seeks to determine how much tax revenue is implicated by the Ordinance at both the city and state levels. To accomplish this, Dr. Angelides first analyzed how many "Tobacco Products Distribution Businesses" there are at present. The Ordinance exempts these companies from the sales ban, and as a result Dr. Angelides assumes that tax revenues from these businesses would be unaffected. Second, Dr. Angelides calculated the reduction in state and city taxes by estimating the sales value of cigars that have not yet been listed by the City as unrestricted, and multiplying sales of those cigars by the applicable tax rates. Dr. Angelides concludes that the Ordinance will implicate nearly $70 million dollars of cigar sales annually, causing the City to lose $5.3 million dollars in tax revenues per year, while the state loses $4.2 million.

But the loss of tax revenues is irrelevant at this stage. Only damage to Plaintiffs matters for this prong. *See, e.g.*, *Cruz-Gonzalez on behalf of D.M.S.C. v. Kelly*, No. CV 16-5727, 2017

WL 3390234, at *6 (E.D. Pa. Aug. 7, 2017) ("[I]njunctive relief requires a showing of irreparable harm *to the movant* if the injunction is denied." (emphasis added)). Plaintiffs' best evidence of irreparable harm *to them*, then, is Dr. Angelides's calculation that the Ordinance would implicate $70 million dollars of cigar sales annually.

The City responds that this estimate is untrustworthy and speculative for several reasons. First, the City argues that Dr. Angelides assumes that the number of "tobacco distribution businesses" will remain constant. Second, Dr. Angelides assumes that many consumers of flavored tobacco will not simply use unflavored tobacco as a substitute. Third, Dr. Angelides assumes that customers will not leave the City of Philadelphia and purchase flavored cigars elsewhere. Fourth, Dr. Angelides assumes that the City's list of unrestricted cigars will not grow as companies like Swisher submit additional cigars for testing.

These objections to Dr. Angelides' report are powerful. Perhaps if this were a *Daubert* motion, the City's objections would carry the day. But at this stage, the Court concludes that Plaintiffs have done just enough to demonstrate irreparable injury absent preliminary injunctive relief. Dr. Angelides' report shows that approximately $70 million in cigar sales are implicated by the Ordinance. And while the exact *magnitude* of damage to Plaintiffs may be speculative, the *likelihood* of damage is not. Both parties concede that Plaintiffs will not be able to recover money damages against the City based on their preemption claims.[6] Thus, even if Plaintiffs sales decrease by an amount lower (even far lower) than estimated by Dr. Angelides, those damages will still constitute irreparable injury because of the City's Eleventh Amendment immunity. *See, e.g.*,

---

[6] At this stage, the Court does not consider the import of Plaintiffs' other claims under the United States Constitution. The City argues that damages are not irreparable because Plaintiffs may be able to recover damages on these other claims. But those claims are not at issue here, and the Court cannot assume that damages will be available for claims whose merits have not been tested or briefed.

*Temple Univ.*, 941 F.2d at 214. Because the Court is convinced that Plaintiffs will suffer at least some harm that cannot be compensated through an award of money damages, Plaintiffs have satisfied this element.[7]

**C. Balance of the Harms and the Public Interest**

Finally, the balance of the equities and the public interest both weigh in favor of an injunction. "The comparison of harm to the Government as opposed to the harm to Petitioners turns most on matters of public interest because these considerations 'merge when the Government is the opposing party.'" *Marland v. Trump*, No. CV 20-4597, 2020 WL 6381397, at *13 (E.D. Pa. Oct. 30, 2020) (quoting *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 332 (3d Cir. 2020)). Because the Government's interest is presumed to align with the public interest, the Court will focus its analysis on whether the public interest would be advanced by an injunction.

Weighing the Plaintiffs' interest in conducting their lawful business against the City's interest in combatting the negative health outcomes associated with smoking tobacco would be difficult indeed. Balancing incommensurable harms is always fraught, particularly in the posture at bar where the parties had only limited time to prepare testimony from appropriate experts.

---

7 Plaintiffs also rely on the declaration of Karen Saber, Vice President of Business Analytics and Strategic Sales Innovation at Plaintiff Swisher. Ms. Saber's declaration relies on Dr. Angelides' report, and further notes that potentially restricted cigars represent 59% of all Swisher Cigars sold in Philadelphia. Ms. Saber goes on to assert that the Ordinance will impair Swisher's goodwill and relationships with distributors and customers. Because Dr. Angelides' report creates a sufficient record for irreparable harm, it is unnecessary to discuss Ms. Saber's declaration at length. However, the Court notes that any probative value of the declaration is muted by the fact that it offers nothing more than Ms. Saber's *ipse dixit* that Swisher's business relationships would be harmed. Plaintiffs filed a belated "Supplemental Proposed Findings of Fact and Conclusions of Law" that, in part, attempted to rehabilitate Ms. Saber's declaration, stating that she is "well-qualified to offer her opinion testimony regarding the impact of the Ordinance." (Doc. No. 25 at 4.) But the Court puts little weight on Ms. Saber's declaration because she does not state *how* her qualifications lead her to believe that Swisher's business interests would be harmed by the Ordinance absent an injunction.

But such a balancing is unnecessary. "[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'" *Marland*, 2020 WL 6381397, at *13 (alteration in original) (quoting *TikTok Inc. v. Trump*, No. 1:20-CV-02658 (CJN), 2020 WL 5763634, at *1 (D.D.C. Sept. 27, 2020)). Courts will not second-guess the legislature's determination that compliance with a valid statute is in the public interest.[8] This is especially true where, as here, a preliminary injunction would merely preserve the status quo. *See, e.g., Kos Pharms., Inc.*, 369 F.3d at 708 ("[O]ne of the goals of the preliminary injunction analysis is to maintain the status quo, defined as the last, peaceable, noncontested status of the parties." (alteration in original) (quoting *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990)); *Pennsylvania v. DeJoy*, No. CV 20-4096, 2020 WL 5763553, at *40 (E.D. Pa. Sept. 28, 2020). The General Assembly has determined that it is in the public interest to preempt enactments like the Ordinance at issue in this case. This Court will not second-guess that judgment.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for a preliminary injunction. An appropriate order follows.

---

[8] In fact, many courts have concluded that likelihood of success on the merits also obviates the need to prove irreparable harm, not unlike Pennsylvania's "per se" irreparable harm rule. *See, e.g., United States v. Ingersoll-Rand Co.*, 218 F. Supp. 530, 544-45 (W.D. Pa. 1963), *aff'd*, 320 F.2d 509 (3d Cir. 1963) ("The Congressional pronouncement in § 7 embodies the irreparable injury of violations of its provisions. No further showing need be made . . . ."); *Temple*, 941 F.2d at 231-14. But this rule has been called into question. *See Pa. Transp. Auth. v. Pa. Pub. Util. Comm'n*, 210 F. Supp. 2d 689, 726 (E.D. Pa. 2002), *aff'd sub nom. Nat'l R.R. Passenger Corp. v. Pennsylvania Pub. Util. Comm'n*, 342 F.3d 242 (3d Cir. 2003) ("[I]n light of conflicting authority as to the proper standard, the Court will proceed with the traditional irreparable harm analysis."); *NRDC v. Texaco Ref. & Mktg., Inc.*, 906 F.2d 934, 937 (3d Cir. 1990) (district court erroneously presumed irreparable harm based on violation of the Clean Air Act); *Freedom Holdings, Inc. v. Spitzer*, 447 F. Supp. 2d 230, 248 (S.D.N.Y. 2004), *aff'd*, 408 F.3d 112 (2d Cir. 2005) (applying the "normal principles of equity" to motion for a preliminary injunction for alleged violations of the Clayton Act). Because the Court has concluded that Plaintiffs have established irreparable harm, it is unnecessary to determine whether that rule applies here.

**BY THE COURT:**

20-3220

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**